# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

Z.J. a minor, by and through )
her next friend Je'taun Jones, )
                                   )
               Plaintiff, )
                                   )
v.                                  ) Case No.: 4:15-CV-00621-FJG
                                   )
KANSAS CITY, MISSOURI )
BOARD OF POLICE )
COMMISSIONERS, et. al. )
                                   )
             Defendants. )

## ORDER

Currently pending before the court is Defendants' Motion to Exclude Plaintiff's Experts Chuck Drago (Doc. # 126), John Nixon (Doc. # 127) and Kurt Krueger (Doc. # 128). Also pending before the Court are three motions for summary judgment - one filed by the Board of Police Commissioners (Doc. # 143), the Detectives (Doc. # 145) and the TAC Officers (Doc. # 147).

### I. FINDINGS OF FACT[1]

Plaintiff Z. J. a minor child, by and through her next friend Je'taun Jones, brought suit against Kansas City, Missouri Board of Police Commissioners members Alvin Brooks, Michael Rader, Angela Wasson-Hunt, Sylvester James, Leland Shurin and officers Jason Rusley, Michael Jones, Barbara Eckert, Caleb Lenz, William Nauyok, Eric Enderlin, Charles Evans, Robert Jorgeonsen, Venasa Ray, and Robert McLaughlin

---

[1] The Court will discuss all of the facts surrounding the events of November 3, 2010 first and will then discuss each of the three motions for summary judgment separately as they relate to each group of defendants.

asserting a claim for excessive force in violation of the Fourth and Fourteenth Amendments and a claim for deliberately indifferent policies, practices, customs, training, and supervision in violation of the Fourth and Fourteenth Amendments.

On October 29, 2010, Nina Whitney was brutally murdered. Ms. Whitney had been stabbed, strangled and appeared to have been sexually assaulted. Sgt. Barbara Eckert's homicide squad including Detectives Ray and Jones were assigned to investigate the Whitney murder. In investigating the murder, it was discovered that Whitney's cell phone was missing from her house. Detectives contacted the phone company to track down the phone and to retrieve call records for the time period after Whitney was murdered. On October 30, 2010, at approximately 01:50 a.m. from using GPS technology, the detectives learned that Whitney's cell phone was located within an 80 meter radius of the area of 118th and Winchester. The eastern edge of that radius was Bristol Avenue. Bristol Avenue is the street immediately east of Winchester. Sgt. Eckert determined that this area was approximately eight blocks due east of Whitney's house. Sgt. Eckert went to that location and walked to the north end of the perimeter. Another Detective called the victim's cell phone. Sgt. Eckert heard the phone ringing while she was standing between two Gatehouse Apartment buildings, 11707 Winchester and 11708 Winchester, at least four times. Sgt. Eckert realized that the phone was located inside one of the two buildings. On October 30, 2010 at approximately 1:30 a.m. Detective Michael Jones and Sgt. Eckert, with other officers recorded the vehicles that were parked off of 117th to 118th and Winchester. No parked vehicles were considered or recorded on Bristol Avenue. Sometime after the murder, someone used the Whitney's phone to call the residence of 11812 Bristol Avenue in

Kansas City.  In the ALERT system[2], the address responded to Lee A. Charles.  Later in the evening of October 30, 2010, someone used the victim's cell phone to call a Family Dollar Store on Blue Ridge Boulevard.  Lee Charles was employed at that store.  Accordingly to the employer, Lee Charles' address was 11812 Bristol Avenue.  Later on the night of October 30, 2010, GPS showed the phone to be in the vicinity of 71 Highway and Main Street in Grandview. Detectives called the phone, it was answered, but no one spoke. However, it sounded like the sounds of a restaurant and a kitchen in the background.  Lee Charles worked at a Popeye's Chicken restaurant near 71 Highway and Main Street in Grandview. Based on this information, Detectives issued a "pick up" for Lee Charles.  Before obtaining the search warrant, the Detectives did not go to the residence to see if Lee Charles still lived at 11812 Bristol nor did they conduct any surveillance of that address.

**Application for Search Warrant**

On November 3, 2010, Detective Mike Jones applied for a search warrant for 11812 Bristol Avenue, Kansas City, Missouri. Detective Jones obtained information from a computer record check that Lee Charles had lived at that address at one time. However, the only evidence that Detective Jones had for the location of the phone was that it was located in either 11707 or 11708 Winchester and not in the plaintiff's residence at 11812 Bristol.  When applying for the search warrant, Detective Jones did not disclose that the GPS had originally tracked the phone to the area of 118th & Winchester, but instead swore that it was traced to the area of 118th & Bristol. Detective Jones knew the only

[2] The ALERT system is a regional criminal justice system that collected criminal history record information from local partner agencies. It also acted as an access point to state and federal criminal justice repositories and department of motor vehicle records.

cell phone location evidence showed the phone was not at the Jones' home on Bristol and 118th, but instead was between two apartment buildings on Winchester. Detective Jones stated in his sworn application for a search warrant for 11812 Bristol, "It is reasonable to believe that the person who has possession of the victim's missing cell phone within hours of her death could be involved in the homicide." Detective Jones failed to disclose to Judge Gillis in obtaining the search warrant for 11812 Bristol, that on October 30, 2010 in the early morning hours, GPS led the detectives to an area between 11707 Winchester and 11708 Winchester, two Gatehouse Apartments & Townhome buildings. When the number was dialed, detectives heard it ringing at least four times in one of the buildings. On November 3, 2010, at 3:00 p.m. Judge Gillis issued a warrant to search 11812 Bristol Avenue for items connected to the Whitney homicide. The warrant authorized detectives to search the residence for cell phones, cell phone chargers, clothing and shoes with blood, knives with trace evidence, items that could be used for strangulation, and a set of keys described by the victim's family. Detective Jones knew at the time that the warrant was executed that Lee Charles was not in the house.

**Arrest of Lee Charles**

Thirty-seven minutes after the warrant was issued, at 3:37 p.m. Lee Charles was arrested by Officer Lantz. Defendant Eckert was contacted to sign the Investigation Arrest Approval Form for Lee Charles.

**Briefing of Tactical Response Team by Homicide Detectives**

Detective Mike Jones contacted the SWAT Team to provide entry and secure the premises so that Detectives could execute the search warrant. Detective Jones

4

contacted Sgt. Rusley at approximately 6:00 p.m. on November 3, 2010. The SWAT

Team obtains information from the investigative team that helps determine how to

execute the warrant and clear the residence. At approximately 6:15 p.m. Sgt. Rusley

conducted a briefing with members of the homicide squad and the SWAT Team. Sgt.

Rusley's team consisted of six members, other than himself: Charles Evans, Robert

Jorgeonsen, William Nauyok, Erik Enderlin, Caleb Lenz and Robbie McLaughlin.  All

police officer defendants attended this briefing. Available information that should be

included in these briefings are descriptions, assignments, instructions that may affect

the execution, photographs of the exterior of the structure, area diagrams and any

problem areas. Homicide is responsible for providing the TAC officers the information in

regards to the investigation and giving them information so that they can effectively

execute the warrant. Detectives revealed to the SWAT Team that the murder suspect

(Lee Charles) was already in custody.  Sgt. Eckert did not know if there was anyone in

the home before the warrant was executed. Neither Detective Jones nor Eckert were

aware of any surveillance done of the home before the warrant was executed. Sgt.

Rusley did not know at the time of executing the warrant, how many people were in the

home or if any of them had a record of violence.  Sgt. Rusley was not provided any

information regarding surveillance of the area nor did he have a floor plan of the home.

After the briefing, Sgt. Rusley, Detective Ray and Officer Enderlin and Officer Evans

conducted a drive-by of the 11812 Bristol Avenue.  Detectives waited approximately a

block away, while the TAC team secured the residence.

**Execution of the Search Warrant**

The warrant required the officers to knock and announce prior to any forced entry of the home. At approximately 7:00 p.m., three and half hours after Lee Charles had been arrested and 45 minutes after being given notice of the warrant, the search warrant was executed by the TAC team. Officer Evans testified that he knocked and announced "Police, search warrant!" When the search warrant was executed, there were four occupants of the home: the plaintiff, two year old Z.J., twenty-four year old Carla Brown (Z.J.'s cousin and caretaker) Z.J's eighty-four year old grandmother, Laverne Charles and sixty-eight year old Leona Smith, who was caring for Mrs. Charles upstairs.

The house had two doors, an outer metal storm door and inner wooden door. Both doors had double key locks and could be unlocked from the inside of the home only by a key.  Both doors were locked at the time of the execution of the warrant. Carla Brown heard dogs barking the front door and went to investigate. Ms. Brown testified that she did not hear the officers knock and announce that they had a warrant. She unlocked and opened the inner wooden door. When she opened the door, she was confronted by the seven member TAC team, wearing full tactical gear and bearing weapons attempting to gain entry into the house. It is disputed whether Ms. Brown jingled or showed the keys in her hand to signify that the officers did not need to break the door. It is also disputed whether she took a few steps back retreating from the door out of the sight of the officers. Two of the TAC officers in statements stated that Brown "waived a set of keys" at the TAC officers after opening the inner door. Other officers however deny that Brown held up any keys. Another officer stated that Brown had initially turned around and walked away, but after being commanded to open the door, was "coming

back toward" them when they broke down the door and deployed the flash bang grenade ("FBG"). Instead of waiting for Ms. Brown to open the door, the TAC team knocked out an upper piece of the outer storm door and then threw a FBG into the opening in the door.  The FBG was thrown over Carla Brown's head and into the living room.  Carla Brown screamed, grabbed her ears and dropped to the floor.  Plaintiff Z.J. was first seen by Officer Evans in the main floor living room, at the bottom of the stairs going up.  She was upset and by herself.  When the FBG exploded, it ignited the curtains in the living room. After the TAC Team entered the home, the only occupants located were the four females.  No one was found to be a threat to the officers' safety or armed with any guns or any weapons.

Officers placed Carla Brown and Leona Smith in handcuffs outside the residence. The officers were unable to put hand cuffs on Laverne Charles failed due to her advanced age and physical limitations. Carla Brown told officers that Lee Charles had been "kicked out" of the residence.  Lavern Charles advised officers that Lee Charles had not lived at the residence for over a year and did not have any property at the house.  He had been at the house on October 30, 2010 to wash his clothes. Carla Brown advised officers that Lee Charles was living in an apartment around the corner with Ricky Cauthen.  Carla Brown obtained the phone number from the caller ID and gave it to Sgt. Eckert.  Due to the information they received about Lee Charles not residing at the residence, the house was not searched at all by the Detectives and no property was seized.

**Flash Bang Grenades**

The particular device that was thrown into the plaintiff's home was a Defense Technology Multi-Port-Plus Diversionary Device ("MPPDD"). The characteristics of this device are: (1) Sound 175 decibels at 5 feet; (2) Flash 6 to 8 million candela for 10 milliseconds; and (3) heat (4,940 F to 5,660 F). The MPPDD is four times louder than a 12 gauge shotgun, 107 times brighter than a car's high beam headlight and burns at twice the temperature of molten steel. Due to the inclusion of magnesium powder in the FBG's, some of the light generated is in the ultraviolet range. This is known to cause damage to the human retina. The hazards of FBGs include injury to sight and hearing with the possibility of psychological injury. FBGs can break glass, windows, cause items to ignite and blow holes in walls. In the 1000 search warrants executed by Sgt. Rusley, a FBG is deployed one-half of the time. In the several hundred search warrants executed by Officer Lenz, an FBG was deployed 75% of the time if the home was occupied. In the 175 to 245 search warrants executed by Officer Evans, a FBG was deployed 70 – 80% of the time. FBGs are known to have caused injury and death.

**No Official Board Policy re: Flash Bang Grenades**

The Board does not have an official policy regarding the use of FBGs in the execution of search warrants. The Kansas City, Missouri Police Department State Search Warrant Procedures are silent regarding the use of FBGs during the execution of search warrants. The KCMPD State Search Warrant Procedures do not require that officers consider and account for the safety of innocent persons occupying the home being searched and instead require officers to consider "innocent members of the public" outside the home being searched. TAC Officers were trained in how to use FBGs, but

not when it was constitutional to do so. The Board was a named defendant in a lawsuit where the plaintiff alleged that an FBG was thrown at him without warning. The frequency in which the TAC Team deploys FBGs gives the Board constructive knowledge that the constitutional rights of citizens have been infringed. In the search warrants executed by Officer Nauyok, FBGs are always deployed. In the 1000 search warrants executed by Sgt. Rusley, an FBG was deployed half of the time. In the several hundred search warrants executed by Officer Lenz, a FBG is deployed fifty percent of the time. In the 175 to 245 search warrants executed by Officer Evans, a FBG was deployed 70 to 80% of the time.

### Location of Whitney's Cell Phone

Fifty minutes after the search warrant was executed at 11812 Briston, Detectives went to 11708 Winchester, without a uniformed officer or the TAC Team and obtained a consent to search from Donald Dotson. The Detectives retrieved Whitney's grey bar type Nokia cell phone and spoke with Ricky Cauthen and Donald Dotson. The address 11708 Winchester was one of the two buildings where Sgt. Eckert had previously heard the cell phone ring four days before the search.

### Search of Jeffrey Moreland's Home

Lee Charles was released from custody after being held for twenty-four hours and was ultimately found not to be involved in Whitney's murder. On July 6, 2011, the Kansas City Regional Crime Lab advised that a DNA sample recovered from Jeffrey Moreland, a former Grandview Police Officer, was tested and matched DNA recovered from Whitney's body on October 29, 2010. Due to the DNA match, a search warrant was served on Moreland's residence at 2904 Twin Pines Drive in Harrisonville,

Missouri.  Before Moreland's home was searched on July 7, 2011, a call was placed to a family member who provided the garage code.  On July 7, 2011, Sgt. Eckert with a uniformed officer and two Detectives entered Moreland's residence through the garage using the code and searched the residence.

**Damages**

The Jones' residence at 11812 Bristol suffered damage. Additionally, a physician has confirmed that plaintiff Z.J. has experienced significant regression in social, emotional, communication and behavior milestones after this incident and has post-traumatic stress disorder.

## II.    STANDARD

A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c). "[T]he substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  If the moving party meets this requirement, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. 242, 248 (1986).  In Matsushita Electric  Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Court emphasized that the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts" in order to establish a genuine issue of fact sufficient to warrant trial.  In reviewing a motion for

10

summary judgment, the court must view the evidence in the light most favorable to the

non-moving party, giving that party the benefit of all inferences that may be reasonably

drawn from the evidence.  Matsushia, 475 U.S. 574, 588; Tyler v. Harper, 744 F.2d 653,

655 (8th Cir. 1984), cert. denied, 470 U.S. 1057 (1985).

## III.    DISCUSSION

### A.  TAC Team's Motion for Summary Judgment

The TAC officers move for summary judgment on plaintiff's claims against them

arguing they are entitled to qualified immunity.  The TAC officers argue that the manner

in which the search warrant was executed, including the use of the FBG was

reasonable.  The TAC Officers also argued that even if they violated the Fourth

Amendment, it was not clearly established at the time that using a FBG was

unreasonable.

### 1.  Qualified Immunity – Two- Part Test

We apply a two-part test to determine the applicability of qualified
immunity. Clayborn v.  Struebing, 734 F.3d 807, 809 (8th Cir.2013). "First,
'whether the facts alleged, construed in the light most favorable to
[plaintiff], establish a violation of a constitutional or statutory right,' and
second, 'whether that right was clearly established at the time of the
alleged violation, such that a reasonable [officer] would have known that
[the] actions were unlawful.'" Id. (quoting Kell v. Triveline, 661 F.3d 981,
985 (8th Cir.2011)).

Hosea v. City of St. Paul, 867 F.3d 949, 955 (8th Cir. 2017). Courts have discretion to

decide which of the two prongs of the test should be addressed first.  Pearson v.

Callahan, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). "Although

qualified immunity is an affirmative defense, the burden is on the plaintiff to plead, *and,*

if presented with a properly supported motion for summary judgment, to present

evidence from which a reasonable jury could find that the defendant officer has violated the plaintiff's constitutional rights." <u>Moore v. Indehar</u>, 514 F.3d 756, 764 (8th Cir.2008)(citations omitted).

## 2. Violation of a Constitutional Right

Plaintiff alleges that at the time of the search, she had a clearly established constitutional right under the Fourth Amendment to be secure in her person from unreasonable search through excessive force.

> Force is constitutionally excessive if it is objectively unreasonable. . . .Determining whether the force used was objectively unreasonable requires balancing of the individual's Fourth Amendment interests against the relevant government interests. . . .The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. . . .We thus allo[w] for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation. . . .And we assess the amount of force used from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.

<u>Hosea</u>, 867 F.3d at 957 (internal citations and quotations omitted). The Court in <u>Hosea</u> continued, "We pay 'careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.' <u>Graham [v. Connor]</u>, 490 U.S. at 396, 109 S.Ct. 1865; <u>see</u> <u>also</u> <u>Malone v. Hinman</u>, 847 F.3d 949, 952-53 (8th Cir.2017), <u>petition for cert filed</u>, (U.S. July 17, 2017)(No. 17-80)(noting the <u>Graham</u> factors)." "Moreover, it is clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public." <u>Brown v. City of Golden Valley</u>, 574 F.3d

491,499 (8th Cir.2009). "People do not automatically lose their right to be free from explosive devices being thrown into their houses simply because there is a valid and outstanding search warrant with respect to the property. The use of a stun grenade must be justified by the particular risk posed in execution of the warrant." Terebesi v. Torreso, 764 F.3d 217, 239 (2d Cir. 2014), cert. denied, 135 S.Ct. 1842 (2015).

Forty-five minutes before they executed the search warrant, the TAC officers attended a briefing.  At the briefing, the officers were informed that that murder suspect who was believed to be living at 11812 Bristol, was already in custody. Sgt. Eckert did not know how many people lived in the home or even if the home was occupied or if any of the residents might have a record of violence. No surveillance had been done of the home before the warrant was executed. The TAC Officers did not have a diagram or floor plan of the house or even any photos of the residence.  A brief drive-by of the house was conducted by Sgt. Rusley, Detective Ray and Officers Enderlin and Evans shortly before executing the warrant. The search warrant authorized the officers to search and seize: cell phones, cell phone chargers, clothing or shoes with blood, knives with trace evidence, items that could be used for strangulation, i.e. cords, wire or rope and a set of keys. So, the TAC Officers were not searching the house looking for a potentially dangerous suspect, they were only looking for items that might have been used in the crime.

The TAC Officers argue that they were justified in breaching the door and using the FBG because there was an immediate threat to their safety. The TAC Officers in their motion state that they knocked on the door and announced "Police, search warrant!"  However, the Court finds that this is a disputed fact, as Ms. Brown testified

13

that she did not hear the Officers knock or announce that they had a warrant. She only went to the door when she heard the dogs inside the home barking. Viewing the facts in the light most favorable to plaintiff, the Court will assume that Ms. Brown did not hear the officers. The TAC Officers allege that Officer Evans instructed Ms. Brown to open the metal outer door, but that Ms. Brown did not obey this Order and either backed away or walked away from the door. There is also disputed testimony regarding what happened at this point. Ms. Brown testified that she had the keys to the door in her hand and waved them in front of the officers, so they would know that she was going to unlock the door, and told them that she was going to unlock the door so they did not need to break it down. Ms. Brown's version of the facts is supported by the testimony of Officer Jorgeonsen in his statement to KCMO internal affairs. Other officers however testified that Ms. Brown did not have any keys in her hand. The TAC officers state that they became "compromised" when according to them Ms. Brown refused to unlock the outer door and moved away from the door. But, they offer nothing else to support their claim that they were in immediate danger. There is no claim that they saw Ms. Brown with a weapon in her hand or that they even saw anyone else in the room behind her. Because of their belief that they were "compromised" the decision was made to break out a portion of the outer door and throw an FBG into the room. The TAC officers argued that when the outer door was not immediately opened, they had to make a "split-second judgment" about how to proceed in a "rapidly-evolving situation." The TAC officers also argue that because the occupants of the house were aware of their presence and had not immediately opened the door, that they needed to deploy an FBG to "divert the attention of any occupants from the front door to the area where they

14

deployed the noise/flash diversionary device, so that his team could safely enter."
(Suggestions in Support, p. 6). However, the Court finds that the TAC officers argument
fails because whether they became "compromised" or not is controverted. Viewing the
facts in the light most favorable to plaintiff, Ms. Brown had the keys to the outer door in
her hand and was in the process of unlocking the door and would have allowed the TAC
Team to peaceably enter the residence. Additionally, it is questionable that they were
"compromised" because this was a knock and announce warrant. So, the residents
would have been aware of their presence even before the door was opened.

There are also disputed issues of fact regarding the use of the FBG. Sgt. Rusley
argues that he deployed the FBG to an area of the house where no one was present.
However, other than encountering Ms. Brown at the front door, the TAC Officers had no
knowledge of who or how many other individuals might be in the home or where they
might be located. Thus, he could not have known at the time that he threw the FBG into
the room if indeed there were any others located in close proximity. Additionally, the
TAC Officers allege that Ms. Brown stepped away from the door, so when Sgt. Rusley
threw the FBG through the opening, he could not have known for sure where Ms. Brown
was. Courts have held that "[I]t cannot be a reasonable use of force under the Fourth
Amendment to throw [a stun grenade] 'blind' into a room occupied by innocent
bystanders absent a strong governmental interest, careful consideration of alternatives
and appropriate measures to reduce the risk of injury." Boyd v. Benton County, 374
F.3d 773, 779 (9th Cir. 204). In light of the foregoing discussion, the Court finds that the
facts construed in the light most favorable to the plaintiff establish that the TAC Officers'
actions were unreasonable and excessive.

### 3. Whether the Right Was Clearly Established.

The second prong of the qualified immunity test requires the Court to examine whether the constitutional right at issue was clearly established. "A right is clearly established if, at the time of violation, 'every reasonable official' would understand that 'what he is doing violates that right.'" Mattos v. Agarano, 661 F.3d 433, 442 (9th Cir.2011), cert. denied, 132 S.Ct. 2682 (2012)(quoting Ashcroft v. Al-Kidd, 563 U.S. 731,741, 131 S.Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011)). "There need not be 'a case directly on point,' but 'existing precedent must have placed the statutory or constitutional question beyond debate." Id.

The TAC officers argue in their motion that it was not clearly established that they violated the Fourth Amendment when they forced the door open after Ms. Brown disobeyed an order to unlock and open it and that it was also not clearly established that Sgt. Rusley violated the Fourth Amendment when he threw the FBG into an area where plaintiff was not located.

"Eighth Circuit case law on when a police officer may constitutionally use a flashbang is sparse." Tuchez v. City of Sioux Falls, No. Civ. 11-4058-KES, 2012 WL 2524979 (D.S.D. June 29, 2012). However, it is also permissible to look to decisions of other circuits to determine if the right is clearly established. In Milan v. Bolin, 795 F.3d 726 (7th Cir. 2015), cert. denied, 136 S.Ct. 1162 (2016), the plaintiff alleged that the police department used excessive force in searching her home. The Evansville police department became aware of internet postings that threatened the police. Typical postings were: "New Indiana law. You have the right to shoot cops." The IP address associated with the posts belonged to 68 year old Louise Milan and her 18 year old

16

daughter.  The Court explained that an IP address is like a phone number, it identifies a computer or computer network and enables a person operating another computer to communicate with it.  The network in Mrs. Milan's home was an unsecured network, meaning that a person within the vicinity of the home, standing outside in the street, could access the network and send messages from it without needing to know a password.  The threats could have been coming from someone inside the house or from someone using the network located near the home. At the time that the police decided to conduct the search, they only knew that the house was occupied by an elderly woman and her two daughters, there was no evidence that any criminals lived in the house or would be present, nor was there was any effort to neutralize another suspect who lived close by. The search was conducted by an eleven member SWAT team. The SWAT team rushed to the front door and without allowing a reasonable time for a response broke open the front door and a window and through these openings hurled two flash bang grenades.  As the grenades exploded, the police rushed in, searched it from top to bottom and found no evidence of any criminal activity.  The police handcuffed the mother and one of her daughters and led them out of the house and questioned them briefly.  After questioning, the police realized that the women had nothing to do with the threats and released them to return to their home. The police learned a day later that a neighbor of Mrs. Milan's had gained access to her open network and used it to post the threats. In striking similarity to the facts of the instant case, the police in <u>Milan</u> did not give the suspect the SWAT team treatment.  They simply requested that he come to police headquarters, which he did, where he was arrested without incident.  The Court in <u>Milan</u> stated:

Police are not to be criticized for taking threats against them and their families seriously. But flash bangs are destructive and dangerous and not to be used in a search of a private home occupied so far as the police knew only by an elderly woman and her two daughters. We cannot understand the failure of the police, before flash banging the house, to conduct a more extensive investigation of the actual suspects: Murray, living two doors away from the Milan home and thus with ready access to Mrs. Milan's open network, and the male Milans. The police neglect of Murry is almost incomprehensible. His past made him a prime suspect. A day of investigation of him would have nailed him, as we know because a day of investigating – the day after the violent search of the home – did nail him. The district judge's denial of the defendant's motion for summary judgment appears eminently reasonable when one puts together the flash bangs, the skimpy basis for the search and its prematurity-the failure to check wither the network was open and the failure to conduct a more extensive investigation before deciding that flash bangs were appropriate means of initiating the search, the resulting neglect of Murray, and the handcuffing of the daughter.

Id. at 730. The Court noted that "the police acted unreasonably and precipitately in flash banging a house without a minimally responsible investigation of the threats." Id.

Precipitate use of flash bangs to launch a search has troubled us before, leading us to declare that 'the use of a flash bang grenade is reasonable only when there is a dangerous suspect and a dangerous entry point for the police, when the police have checked to see if innocent individuals are around before deploying the device, when the police have visually inspected the area where the device will be used and when the police carry a fire extinguisher." Estate of Escobedo v. Bender, 600 F.3d at 784-85. . . .So while the defendants are correct to point out that a reasonable mistake committed by police in the execution of a search is shielded from liability by the doctrine of qualified immunity . . .in this case the Evansville police committed too many mistakes to pass the test of reasonableness.

Id. Similarly, in the instant case, the Court also finds that the defendants committed too many mistakes to pass the reasonableness test. The only reason that the officers had to search the house located at 11812 Bristol Avenue was because Lee Charles at one point used Whitney's cell phone to call a phone number associated with that address. When the detectives were investigating, they conducted a computer check and found

that Lee Charles had once lived at that address. However, before the search on 11812 Bristol, the detectives knew from their GPS search and their own on the ground investigation that the phone was not near 118th & Bristol, but was instead in the area of 118th & Winchester.  Indeed, when they called Whitney's cell phone, they could hear the phone ringing, confirming that it was located in either of two apartment buildings - either 11707 Winchester or 11708 Winchester.  As in <u>Milan</u>, after the TAC Team had broken down the door and flash banged the home at 11812 Bristol, the detectives walked around the corner to 11708 Winchester, the apartment building where they had heard the cell phone ringing a few days earlier. The Detectives went to the apartment without a uniformed officer or the TAC Team and obtained verbal consent to search the apartment.  Whitney's cell phone was located inside the apartment. With just some minimal investigation the detectives could have realized that Lee Charles did not live at 11812 Bristol  Avenue, that he was staying around the corner and that the phone was located at that location.  This information could have been obtained by contacting the residents of 11812 Bristol Avenue before the search or by questioning Lee Charles after he was picked up on the afternoon of November 4, 2010.

In <u>Estate of Escobedo v. Bender</u>, 600 F.3d 770 (7th Cir.), <u>cert.</u> <u>denied</u>, 562 U.S. 962 (2010), the decedent called 911 and reported that he was armed with a gun and wanted to shoot himself.  The decedent stated that he was seeking help and he had no intention of harming anyone else or the police.  The defendants deployed a flash band grenade while another team made its entry into the decedent's apartment.  A second grenade was deployed when the team entered decedent's bedroom.  Despite the fact that the decedent had possession of a gun, there was no evidence that he was violent,

dangerous, he was not the subject of an arrest and did not pose an immediate threat to

police. The Court in that case stated:

> Despite the absence of a great deal of precedent in this area, the pertinent
> holdings and dicta do show a clear trend in the law that address the
> egregious circumstances of this case; even if the contours of the
> constitutional implications of the use of "flash bang" devices in general is
> not clear; it is abundantly clear that this case arises in precisely the
> circumstances that this Court and other circuits have sought to avoid by
> providing detailed guidance on when the use of the flash bang devices is
> (and is not) appropriate under the Constitution. . . .However, on the facts
> of this case, the officer's conduct in the use of the flash bang deices so
> clearly exceeded the bounds of reasonableness in the circumstances that
> it cannot be said to lie near the 'hazy border between excessive and
> acceptable force' along which qualified immunity shields officers from
> liability for their snap judgments, if those judgments prove to be wrong
> upon further reflection. Based on the pre-existing case law, it was clearly
> established as of July 19, 2005, that throwing a flash bang device blindly
> into an apartment where there are accelerants, without a fire extinguisher,
> and where the individual attempting to be seized is not an unusually
> dangerous individual, is not the subject of an arrest, and has not
> threatened to harm anyone but himself, is an unreasonable use of force.
> Therefore, taking the facts as presented to us from the district court, the
> Defendants are not entitled to qualified immunity and the issue of the
> officers' decisions must be presented to a jury.

Estate of Escobedo, 600 F.3d at 786 (internal citations omitted). Similarly, in the instant

case, viewing the facts in the light most favorable to the plaintiff, the Court finds that it

was clearly established as of November 3, 2010, that breaking down a door and

throwing a flash bang grenade into a home when the suspect who supposedly lived at

the home was already in custody and the individual opening the door was cooperating

and was in the process of unlocking the door and where the officers had no reason to

suspect that there were any criminals who lived at the home nor that there would be

anything that would put them at risk of personal harm was an unreasonable use of

force. Therefore, the Court finds that the TAC Team officers are not entitled to qualified

immunity and the issue of the officers' decisions must be presented to a jury. Accordingly, the Court hereby **DENIES** the TAC Team's Motion for Summary Judgment (Doc. # 147).

## B. Detectives' Motion for Summary Judgment

The Detectives argue that they are entitled to qualified immunity because their actions were reasonable. They argue that it was reasonable to use the TAC Team to enter and secure 11812 Bristol Avenue before they searched it.

Plaintiff argues that the Detectives are not entitled to qualified immunity for two reasons: 1) The Detectives omitted key facts and provided misleading and inaccurate statements in order to obtain the search warrant and 2) the Detectives failed to conduct a proper investigation prior to the warrant's execution and as a result choose to employ the TAC Team to execute the warrant when no exigent circumstances existed to use such a show of force.

### 1. Omission of Facts/Misleading & Inaccurate Statements

Detective Jones testified that the Detectives gathered as a team to discuss the information to put in the application for a search warrant. When questioned during his deposition, Detective Jones admitted that he did not include any information in the Application for a Search Warrant that the Detectives had walked the area and heard the phone ringing between two apartment buildings located at 11707 Winchester and 11708 Winchester.  Detective Jones stated only in the application that the phone had been located in the area of 118th & Bristol. Detective Jones also indicated in the application for the warrant that some independent verification had been made that Lee Charles actually lived at 11812 Bristol, when in fact there had been no independent verification.

Additionally, Sgt. Eckert also knew that the phone was located between 11707 and 11708 Winchester four days before the search warrant application. Eckert, Jones and other detectives took down the license plate numbers of vehicles that were parked off of 117th and 118th and Winchester. No vehicle plates were recorded on Bristol Avenue. However, none of this information was disclosed in the Application for the Search Warrant. Additionally, Detective Jones affidavit states "[a] check of 11812 Bristol, revealed Lee A. Charles . . .to reside there." However, the only "check" that the Detectives performed was by looking at a computerized database. Plaintiff argues that Detective Jones is liable under §1983 because he omitted and misrepresented material facts in the search warrant affidavit. Additionally, she argues that Detectives Eckert and Ray are also liable because they were constructively aware of and were complicit in Jones' misrepresentations on the warrant, yet moved forward with the search.

In Walker v. St. Louis, Missouri, City of, No. 4:15CV1254CDP, 2016 WL 7474989 (E.D.Mo. Dec. 29, 2016), the Court stated, "[i]t is clearly established that the Fourth Amendment requires a truthful factual showing of probable cause before a warrant can issue." Id. at *3 (citing Moody v. St. Charles Cty., 23 F.3d 1410,1412 (8th Cir.1994)(citing Burk v. Beene, 984 F.2d 489,494 (8th Cir.1991)).

Plaintiff states that "[a] warrant based upon an affidavit containing 'deliberate falsehood' or 'reckless disregard for the truth' violates the Fourth Amendment and subjects the police officer to §1983 liability." Morris v. Lanpher, 563 F.3d 399, 402 (8th Cir.), cert. denied, 558 U.S. 970 (2009)(citing Bagby v. Brondhaver, 98 F.3d 1096,1098 (8th Cir. 1996)). If a fact is omitted that would have been 'critical to the probable cause

determination, recklessness may be inferred." <u>United States v. Reivich</u>, 793 F.2d 957,961 (8th Cir. 1986).

Detectives argue that Jones did not omit or misrepresent information in the Application for the Search Warrant. The Court will examine each of the alleged misrepresentations/omissions.

### a. Where Was the Phone Originally Traced

In the Application for a Search Warrant, Detective Jones stated:

> On 10/30/10 an emergency trace of the victim's phone was conducted and utilizing GPS information. The phone was traced to the area of 118th and Bristol, Kansas City, Missouri at approximately 0130 hours. Call records indicated a phone call was made from the victim's cell phone to the residence of 11812 Bristol, Kansa City, Missouri at approximately 8:55 p.m. on 10-29-10, which was after the victim had been discovered deceased.

(Doc. # 146-14).

Plaintiffs argue that this is misleading because the phone had originally been traced to 118th & Winchester. The Court does not find this single statement deliberately misleading because the GPS information only stated that the phone was in an 80 meter radius which included both 118th & Bristol and 117th & Winchester.

### b. Where Detectives Heard the Phone Ringing

Despite stating above that the phone was originally traced to the area of 118th & Bristol, Detective Jones omitted information that the Detectives while walking in the area called Whitney's cell phone and could hear it ring at least four times between the two apartment buildings on Winchester. The Application also omits any reference to the fact that the Detectives took down the license numbers of individuals living in the area of 118th & Winchester. The Court finds the omission of any information about where the

phone was located when the Detectives heard it ringing could be viewed as being misleading, because there would be no reason to authorize a search of the 11812 Bristol when Detectives knew that the phone was instead in one of two apartment buildings at 118th and Winchester.

### c. Independent Verification of Where Charles Lee Resided

The Application also states that "[a] check of 11812 Bristol revealed that Lee A. Charles B/M 05-29-1957 to reside there." The Application fails to state what kind of a "check" was been done to verify that Lee Charles resided at this address. The Application omits information that no independent verification was performed, but rather Detective Jones simply consulted a computer database which showed that Lee Charles had lived at that address at some point in time.

Detectives state that in order to defeat their Motion for Summary Judgment, plaintiff must prove: 1) "that facts were omitted with the intent to make, or in reckless disregard of whether they make, the affidavit misleading;" and 2) "that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause." Block v. Dupic, 758 F.3d 1062,1063-64 (8th Cir. 2014). The Court finds that plaintiff has met this burden and that viewing the facts in the light most favorable to plaintiff a reasonable jury could find that the Detective misrepresented or omitted information and that if the correct information was supplied, it would not support a finding of probable cause. The Court also finds that this right was clearly established at the time. Thus, the Court finds that the Detectives are not entitled to assert the defense of qualified immunity.

## 2.    Failure to Conduct Proper Investigation – Use of TAC Team

When a § 1983 plaintiff claims that the use of a SWAT Team to execute a warrant itself amounts to excessive force, courts "review the decision to use that degree of force by 'balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179,1190 (10th Cir.2001) cert. denied, 535 U.S. 1056 (2002)(citing Tennessee v Garner, 471 U.S. 1,8 (1985)). "[T]he decision to deploy a SWAT team to execute a warrant must be 'reasonable' because it largely determines how the seizure is carried out, thereby determining the extent of the intrusion on the individual's Fourth Amendment interests." Holland, 268 F.3d at 1190.  In Rush v. City of Mansfield, 771 F.Supp.2d 827 (N.D.Ohio 2011), a detective conducted a cursory investigation and based his affidavit to search the plaintiff's home on the statements of an informant and her ex-husband.  The detective disregarded or failed to check into readily available information to verify what he had been told. The Detective requested that a SWAT Team execute the search warrant.  The Court in that case found that the highly intrusive search and seizure occurred despite:

> (1) The absence of any real exigency (highlighted by the petty nature of the crime being investigated); (2) easily obtainable knowledge that residents of the house, including the primary target of the search, has called law enforcement officials recently for help; (3) actual knowledge that law-abiding citizens would be present; (4) exclusive reliance on the [informant] as a source of information about the danger the officers were likely to face and; (5) knowledge that the primary target of the search was a minor suspected of a petty, non-violent, crime.

Id. at 859. The Court in that case found that a reasonable jury could find that the use of the SWAT Team under these circumstances and in this manner was unreasonable.

In the instant case, plaintiff argues that there was so little pre-investigation into the plaintiff's residence that the decision of the Detectives to employ the TAC Team cannot be justified on the grounds that the Detectives had any safety concerns. The Detectives knew that Lee Charles had been arrested earlier in the afternoon, so they knew that their primary suspect would not be at 11812 Bristol. However, in the almost three hours between when Lee Charles was arrested and the search was executed, no effort was made to interview Mr. Charles or confirm that he even lived at 11812 Bristol. The Detectives had obtained no other information regarding who owned or resided at the home or if it was even occupied, they had done no surveillance of the home and had not taken any photos of the home. In sum, the Detectives had no information that there were exigent circumstances or any other factors that might have made executing the search with the TAC Team necessary. Thus, the Court finds that a reasonable jury could find that the use of the TAC Team under these circumstances was unreasonable. The Court also finds that the right to be free from unreasonably intrusive searches was clearly established at the time. "[T]he decision to deploy a SWAT team to execute a warrant must be 'reasonable' because it largely determines how the seizure is carried out, thereby determining the extent of the intrusion on the individual's Fourth Amendment interests." Holland, 268 F.3d at1190. Estate of Smith v. Marasco, 430 F.3d 140, 149 (3d Cir.2005)("[The] decision to employ a SWAT-type team can constitute excessive force if it is not 'objectively reasonable' to do so in light of 'the totality of the

circumstances.' "(citations omitted)). The Court finds that in the instant case, the Detectives are not entitled to summary judgment on qualified immunity grounds because a reasonable jury could find that in light of the totality of the circumstances, it was not objectively reasonable to employ the TAC Team to execute the warrant in question. Accordingly, the Court hereby **DENIES** the Detectives' Motion for Summary Judgment (Doc. # 145).

C.      **Board's Motion for Summary Judgment**

The Board of Police Commissioners ("The Board") argues that it is entitled to summary judgment because the police officer defendants did not violate plaintiff's constitutional rights. However, as discussed above, the Court has found that the plaintiff has shown that there are disputed issues of material fact and that a jury could find that the defendants' violated her constitutional rights. So, the Court will deny the Board's Motion on this basis. The Board also moves for summary judgment on the basis that Plaintiff cannot show that the Board was deliberately indifferent to constitutional violations. The Board argues that it can only be liable when the employee's action was "pursuant to official municipal policy" or custom. Monell v. Dept. of Social Services of City of New York, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). The Board argues that the Plaintiff cannot point to a facially unconstitutional policy that affirmatively sanctions unconstitutional conduct. The Board argues that Plaintiff cannot show that there was widespread use of FBGs in violation of constitutional rights and that the Board was deliberately indifferent to or tacitly authorized conduct of which it was unaware.

Plaintiff argues that the Board was deliberately indifferent to the officer's persistent unconstitutional use of FBGs. Plaintiff states that in order to hold the Board liable for such an alleged unofficial custom she must demonstrate: 1) existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the Board's employees; 2) deliberate indifference to or that the Board tacitly authorized such conduct after notice to the Board of the misconduct and 3) injury to the plaintiff by acts pursuant to the Board's custom. <u>Snider v. City of Cape Girardeau</u>, 752 F.3d 1149,1160 (8th Cir. 2014).

Plaintiff also argues that the Board is liable for failing to direct or otherwise train TAC Team officers in the use of FBGs. <u>City of Canton v. Harris</u>, 489 U.S. 378, 109 S.Ct.1197,103 L.Ed.2d 412 (1989).

### 1. Board's Deliberate Indifference to Officers' Use of Flash Bang Grenades

In the instant case, it is undisputed that the Board has no policy regarding the use of FBGs. (Doc. # 144-1, Affidavit of Sgt. Rusley).  Plaintiff alleges that the Board has a custom allowing its' officers to use FBGs in the execution of search warrants as a matter of routine and without regard for the safety of innocent occupants, i.e. children and the elderly within the residence being searched.

Plaintiff argues that the Board had knowledge of a 2010 case where the plaintiff alleged that a KCMO police officer threw a FBG at him while he stood on a public sidewalk. In addition to this actual knowledge of FBGs, plaintiff argues that the Board has constructive knowledge of the  unconstitutional use of FBGs through the sheer numbers of FBGs that are reportedly deployed by the TAC Team. Office Nauyok testified that FBGs were "always" deployed if a residence was being searched and was

occupied. Sgt. Rusley stated that FBGs were deployed in half of the search warrants that he executed. Officer Lenz testified that FBGs were used 75% of the time if the home was occupied. Officer Evans testified that a FBG was deployed in 70 to 80% of the search warrants he has executed. Plaintiff argues that the routine use of FBGs is unreasonable and instead of using them when they have a particularized need, they are instead being deployed routinely with little regard for the safety of the occupants inside the homes where they are used. Plaintiff argues that the TAC Team's routine customary deployment of FBGs anytime a warrant is executed on an occupied dwelling is unreasonable. Plaintiff argues that the number of the FBGs that are being deployed by the TAC Team is a fact that the Board should have reasonably known about. The Court agrees and finds that plaintiff has shown that there are disputed facts regarding whether there was a continuing, widespread, persistent pattern of routine use of the FBGs by the TAC Team without any regard for the safety of the occupants of the residence, whether the Board was deliberately indifferent to or tacitly authorized this custom and whether this custom was responsible for plaintiff's injuries.

### 2. Inadequate Training re: Flash Bang Grenades

Plaintiff argues that the TAC officers received little to no training in the use of FBGs. Plaintiff states that the TAC officers testified that they received training in how to deploy the FBGs, but not when it was acceptable to do so. In the City of Canton, 489 U.S. at 387, the Supreme Court stated, "if a concededly valid policy is unconstitutionally applied by a municipal employee, the city is liable if the employee has not been adequately trained and the constitutional wrong has been caused by that failure to train."

For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights.

City of Canton, 489 U.S. at 390 n. 10.

In Tuchez, 2012 WL 2524979, the court stated:

The Eighth Circuit has reasoned that a plaintiff claiming a municipality is liable under §1983 for failure to train must make a three-part showing: " '(1) the [city's] . . .training practices [were] inadequate; (2) the [city] was deliberately indifferent to the rights of others in adopting them, such that the failure to train reflects a deliberate or conscious choice by [the city]; and (3) an alleged deficiency in the . . .training procedures actually caused the plaintiff's injury.'" Parrish v. Ball, 594 F3d 993, 997 (8th Cir.2010)(quoting Andrews v. Fowler, 98 F.3d 1069,1076 (8th Cir. 1996)).

Id. at *11.

In the instant case, it is undisputed that there is no official policy regarding the use of FBGs in the execution of search warrants. The Kansas City Missouri Police Department State Search Warrant Procedure outlines the procedures for obtaining, serving and executing a search warrant by officers. The policy references a need to be aware of individuals outside of the premises but does not contain any provisions for the protection or safety of innocent occupants inside a residence. The State Search Warrant Procedure does not address the use of FBGs when executing a search warrant. The Board has offered no evidence that TAC officers received any specific type of training or certification regarding FBGs or when it is appropriate to deploy these devices. The Board also offers no real response to plaintiff's argument that the officers are inadequately trained, other than to state that plaintiff has no evidence of their inadequate training. The Court finds that plaintiff has shown that a reasonable jury could

find the Board had notice that its lack of a policy or any training regarding the use of FBGs was likely to result in a constitutional violation. Thus, the Court finds that the Board's failure to implement any policy or provide any training to the TAC Team officers greats a genuine dispute of material fact. <u>Atkinson v. City of Mountain View, Mo.</u>, 709 F.3d 1201, 1216 (8th Cir.2013).

Accordingly, because the Court finds that there are genuine issues of material fact regarding whether the Board was deliberately indifferent to its officers use of FBGs and whether the lack of policies or training regarding the use of FBGs was so inadequate that it violated plaintiff's constitutional rights, the Court hereby **DENIES** the Board's Motion for Summary Judgment (Doc. # 143).

**D.    Motions To Strike Plaintiffs' Experts**

Under Fed.R.Evid. 702, a "witness properly qualified as an expert may testify in regard to their 'scientific, technical, or other specialized knowledge' so long as it serves to 'assist the trier of fact to understand the evidence or determine a fact in issue.' Fed.R.Evid. 702." <u>Alberternst v. Hunt</u>, No. 4:10-CV-642-JAR, 2011 WL 6140888, *6 (E.D.Mo. Dec. 9, 2011). District courts also act in the role of a "gatekeeper" to ensure that only relevant and reliable opinion testimony is admitted. <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 589 (1993). In <u>Khottavongsa v. City of Brooklyn Center</u>, No. 16-cv-1031(RHK/DTS), 2017 WL 3822877 (D.Minn. Aug. 30, 2017), the Court stated:

> To determine reliability, the Court should examine (1) whether the theory or technique can be and has been tested, (2) whether it has been subjected to peer review and publication, (3) the known rate of potential error, and (4) whether the theory or technique has been generally accepted.

Id. at *4 (citing <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. at 589). "[T]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross examination." <u>Bonner v. ISP Techs., Inc.</u>, 259 F.3d 924, 929 (8th Cir. 2001). An expert should be excluded "[o]nly if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury." <u>Id</u>. at 929-30.

### 1. Chuck Drago

Defendants seek to exclude the following five legal conclusions and two opinions of Drago's:

- He implies that the Fourth Amendment imposes on officers "a duty to minimize the dangers to any children or innocent bystanders that might occupy the premises" during the execution of a search warrant. (Report para. 2)
- He states that the "officers acted improperly" in the amount of investigation into who occupied the residence, which again heavily implies that the officer's violated the Fourth Amendment (Report, para, 6).
- "Opinion B: The use of force to execute the search warrant was unreasonable, unnecessary, and inconsistent with accepted police practices."
- "The police officers no longer had probable cause to believe that there were fruits of the crime inside the residence." (Report, para 28).
- "Opinion C: The use of a Noise, Flash, Diversionary Device (NFDD) in this incident was unreasonable and falls below the standard of care."
- "There was no reason to distract the occupants of the house since they already knew where the police were entering." (Report, para 42).
- He states that the Tactical Response Team will use "unnecessary force as as the NFDD on nonresistance innocent bystanders. (Report, para 45).
- He states that Sgt. Rusley acted "with reckless disregard" for the occupants. (Report, para 57)
- "The lack of a proper policy along with the inadequate training and poor supervision has created a culture within the police department that constitutes a moving force behind the reckless disregard for the safety of innocent bystanders as seen in this case." (Report, para 90).

Defendants argue that Drago's statements regarding wheher the officers' conduct was proper, reasonable or necessary or whether probable cause existed at the

time that the warrant was executed are inadmissible legal conclusions. Defendants also assert that the statement whether the lack of a policy was a moving force is a legal standard and Drago's opinion on this is inadmissible.

In Khottavongsa, the defendants moved to exclude Drago in that case, arguing that because he offered opinions that the officers acted unreasonably, his opinion should be disregarded. However, the Court found:

> Drago in fact states that the officer's' conduct is unresonable in light of accepted police practices. While Drago cannot tell the jury that a particular use of force was unreasonabe, he can certainly express his opinion as to whether that use of force comported with accepted police practices and training without couching his opinion in "reasonableness" terms. Should he stray into offering testimony on ultimate legal issues, Defendants may object to that testimony.

Id. at *4. The Court agrees and finds that limiting Drago's testimony in this manner is appropriate.

> While expert testimony on police practices and the use of force is generally admissible in 1983 excessive force cases, . . .the Court will not allow [the expert] either by his report or his testimony at trial, to offer any legal conclusions which either explicitly or implicitly touch on the ultimate legal issue in this case, that is, whether Defendant's conduct was reasonable under the totality of the circumstances they faced, particularly where, as here, the facts are in dispute.

Alberternst v. Hunt, No. 4:10-CV-642-JAR, 2011 WL 6140888, *6 (E.D.Mo. Dec. 9,2011)(internal citations omitted).

With regard to the IACP model policies, the Court also finds that these policies are reliable and relevant and appropriate for Drago to cite in his opinions. Plaintiff explains that because the KCPD was lacking in policies of their own in certain areas, it was appropriate for Drago to look to the IACP for model police regarding the use of FBGs. The Court also finds that Drago's opinions are reliable and will assist the trier of

fact.  Accordingly, the Court hereby **DENIES** defendant's Motion to Exclude Chuck

Drago.

**2. Nixon**

Defendants moves to exclude four of Nixon's statements or opinions:

- He states that light in the ultraviolet range "is known to cause damage to the human retina." (Nixon Report, 6).
- "Due the foregoing hazardous effects of the flash-bang device, care should be exercised when one is deployed in the vicinity of humans, especially children and the elderly." (Nixon Report, 7).
- The hazards of the flash-bang device include injury to sight and hearing, with the possibility of psychological injury. (Nixon, Report, 8).
- "The incident would most likely be described by adults as one of domestic terror, a small toddler must have perceived it as the end of the world-assaulted by seven Darth Vaders." (Nixon Report, p. 2)

Defendants argue that Nixon is not qualified to offer opinions on the potential injuries

associated with the noise/flash diversionary device because he is a mechanical

engineer and is not a doctor.  Defendants argue that he is not qualified to testify as an

expert about what causes damage to the human retina, the human ear or what type of

psychological injury might be associated with a noise/flash diversionary device. Plaintiff

argues in opposition that the objective of Nixon's report is to positively quantify the

output of a noise/flash diversionary device in general.  Plaintiff argues that Nixon is not

purporting to testify as to the perception of ZJ as an individual, but instead is purporting

to present his opinion on the potential effects of noise/flash diversionary devices on

humans generally. Thus, plaintiff argues that defendant's motion to exclude really goes

to the weight given the opinion, rather than its admissibility.  In such cases, plaintiff

argues that the proper means for the opposing party to examine the factual basis of the

opinion is through cross-examination.  In reply, defendants state that there is nothing in

Nixon's knowledge, skill, experience, training or education as a mechanical engineer that qualifies him to make statements that an adult would perceive a noise/flash diversionary device as "domestic terror" and that the a child would perceive the device as the "end of the world - assaulted by seven Darth Vaders." Additionally, defendants argue that Nixon is not a medical doctor, an ophthalmologist or retina specialist, a psychologist, psychiatrist or otolaryngologist and when his testimony strays into these fields it is outside the scope of his expertise. The Court agrees and thus will **GRANT** the Motion to Exclude Nixon's opinion **in PART**. Nixon will be allowed to testify as regarding the output of the noise/flash diversionary device, but will not be allowed to testify regarding the damage to the human retina, care exercised when used near elderly or young children, injury to hearing or sight or whether or how it could be perceived by adults and/or children.

### 3. **Krueger**

Defendants argue that the Court should exclude Krueger's testimony regarding the potential economic loss damages because plaintiff cannot show that this will assist the fact finder. Defendants argue that Dr. Krueger acknowledges that economic loss damages are not subject to precise measurement and that he will have to speculate that the alleged injury will affect plaintiff's earning capacity and also speculate as to her pre-injury earning capacity. Defendants argue that there is nothing in his report to support a finding that the alleged injury will affect plaintiff's earning capacity. In reply, plaintiff notes that as a basis for presenting earning capacity losses, Dr. Krueger relies upon the unchallenged opinion that ZJ had developed post-traumatic stress disorder stemming from the traumatic event in her home. Plaintiff states that Dr. Krueger goes on to

provide the trier of fact with scholarly information that the population of persons with mental disorders, on average, experience reductions in earning capacity ranging from 10% to 35%. As a basis for presenting pre-injury earning capacity losses, Dr. Krueger relies on the educational and economic success of ZJ's parents, reliable federal economic data and peer-reviewed generally accepted economic methodologies. Plaintiff notes that while "[e]valuating a future lost wage claim necessarily involves some estimation, . . .that does not render such testimony unhelpful to a jury." (Reply Suggestions, p. 7). The Court agrees and finds that Dr. Krueger is qualified to render an opinion, the methodology underlying his opinion is scientifically valid and his testimony in estimating plaintiff's future earning capacity will be helpful to the jury in their damage valuation of the case. Accordingly, Defendants' Motion to Exclude the Opinion of Krueger is hereby **DENIED**.

### IV.     Conclusion

Accordingly, for the reasons stated above, Defendants' Motion to Exclude Plaintiff's Expert Chuck Drago (Doc. # 126) is hereby **DENIED**; Defendants' Motion to Exclude Plaintiff's Expert John Nixon (Doc. # 127) is **GRANTED IN PART** and Defendants' Motion to Exclude Plaintiff's Expert Kurt Krueger is hereby **DENIED** (Doc. # 128). The Motion for Summary Judgment filed by the Board of Police Commissioners is hereby **DENIED** (Doc. # 143), the Motion for Summary Judgment filed by the Detectives is hereby **DENIED** (Doc. # 145) and the Motion for Summary Judgment filed by the TAC Officers is hereby **DENIED** (Doc. # 147).

Date:  September 29, 2017                              **S/ FERNANDO J. GAITAN, JR.**
Kansas City, Missouri                                   Fernando J. Gaitan, Jr.
                                                        United States District Judge